**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TAKITIA YELDELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:09-cv-01584-JEO** |
| | ) | |
| **WELLS FARGO BANK, N.A.,** | ) | |
| **NATIONAL LOCATING AND** | ) | |
| **RECOVERY, INC., and ROBERT** | ) | |
| **GETTIG,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

The above-styled action is brought by the plaintiff, Takitia Yeldell (hereinafter

"Plaintiff"), against the defendants, Wells Fargo Bank, N.A., ("Wells Fargo") National Locating

and Recovery, Inc., ("NLR") and Robert Gettig ("Mr. Gettig") (hereinafter referred to

collectively as "Defendants"), for damages incurred when Defendants repossessed her car on

March 6, 2009.  The parties have consented to the exercise of jurisdiction by the undersigned

pursuant to 28 U.S.C. § 636(c).  (Doc. 40).[1]  It is before the court on the following motions:

    (1)    Plaintiff's Motion for Partial Summary Judgment against Defendants (doc. 18);

    (2)    NLR and Mr. Gettig's Motion for Summary Judgment (doc. 19);

    (3)    Wells Fargo's Motion for Partial Summary Judgment (doc. 21); and

    (4)    Plaintiff's Motion to Strike NLR and Mr. Gettig's reply brief in support of their

            Motion for Summary Judgment (doc. 27).

The motions have been fully briefed and are now subject to the court's review.  Upon

---

[1]  References to "Doc(s).____" are to the documents as numbered by the Clerk of the Court in the court's
record of the case.

consideration, the court finds that Plaintiff's Motion for Partial Summary Judgment (doc. 18) is due to be denied.  NLR's and Mr. Gettig's Motion for Summary Judgment (doc. 19) is due to be granted in part and denied in part.  Wells Fargo's Motion for Partial Summary Judgment (doc. 21) is due to be denied.  Plaintiff's Motion to Strike (doc. 27) is due to be denied.

## I.      FACTUAL HISTORY

On December 11, 2007, Plaintiff entered a security agreement whereby Wells Fargo financed her purchase of a 2005 Dodge Magnum from an automotive dealer in Birmingham, Alabama.  (Compl. ¶ 6; Whiteside Decl.¶ 2).[2]  The vehicle provided the collateral for Wells Fargo's security interest under the agreement.  (Compl. ¶ 6; Whiteside Decl. ¶ 5).  Under the terms of the agreement, Plaintiff agreed to pay Wells Fargo 72 monthly installments of $407.34, with the first installment due January 25, 2008.  (Whiteside Decl. ¶ 4).  The contract provided that Plaintiff would be in default if she "fail[ed] to perform any obligation that [she had] undertaken" therein.  (Whiteside Decl. ¶ 7; Whiteside Decl. Exh. A).  In the event of Plaintiff's default, Wells Fargo was vested with the right to "immediately take possession of the [Vehicle] by legal process or self-help."  (Whiteside Decl. ¶ 8; Whiteside Decl. Exh. A).  The contract provided further that Wells Fargo could sell the vehicle and sue Plaintiff for any deficiency.  (*Id.*)

Plaintiff failed to pay her first installment under the security agreement in January 2008. (Whiteside Decl. ¶¶ 10, 21; Whiteside Decl. Exh. C).  In February 2008, she paid $500, and in March she paid $315.  (Whiteside Decl. ¶ 21).  She did not make any payments for the months of April, May, or June of 2008.  (*Id.*)

---

[2] Plaintiff's Complaint is located at Exhibit A, pp. 6-16 of 40, to Defendants' Notice of Removal (doc. 1). The declaration of Ellen Whiteside, Ops. Legal Specialist for Wells Fargo, is located at Exhibit 1 to Wells Fargo's Motion for Summary Judgment (doc. 21).

Wells Fargo contacted a recovery agency, National Locating and Recovery, Inc., to repossess the vehicle on July 7, 2008.  (NLR's Answers to Interrogatories at ¶ 3 (doc. 18, Exh. A)).  NLR dispatched Mr. Gettig, who had been employed with NLR for approximately five years, to complete the recovery of Plaintiff's vehicle.  (Gettig Dep. at 46).  Mr. Gettig described his encounter with the plaintiff as follows:

> Q:    What do you remember about the very first repossession?
> A:    Okay. [Plaintiff] came out and was wondering what was going on.  I showed her the paperwork.  She wasn't happy about it, but she seemed to understand.  She got her stuff out, and that was it.

(Gettig Dep. at 45-46).

Plaintiff recalled the same event as follows:

> A:    Well, due to my illness[3], I had been in and out of the hospital, so when [Mr. Gettig] showed up that day, I had no objection to him ... taking the car, because I knew that I had been in the hospital and there were some questions about the payment.

(Pl. Dep. at 21-22).

On July 9, 2008, Plaintiff paid Wells Fargo $2,391.67 to reinstate the loan, and retook possession of the vehicle.  (Whiteside Decl. ¶ 15; Whiteside Decl. Exhs. C & D).  She made no payments in August or September, but paid $700 in October to satisfy her August and part of her September obligations to Wells Fargo.  (Whiteside Decl. at ¶¶ 16-17).  She paid various amounts, all less than $407.34, during each month between November 2008 and February 2009.  These amounts were applied to Plaintiff's previously underpaid obligations, but did not bring the loan

---

[3]  Plaintiff testified that she suffers from Crohn's Disease, which she described in her deposition as "a disease of the gastrointestinal system.  It causes pain, nausea, vomiting, a lot of hospitalization, sometimes intestinal walls can be blocked.  Surgery can be required."  (Pl. Dep. at 10).  She has been classified as "disabled" and receives Social Security Disability Insurance.  (*Id*. at 9).  She has not been employed, part-time or full-time, since 2002.  (*Id*. at 17).

current.  When she failed to make any payment for March 2009, Wells Fargo determined that

Plaintiff's delinquency amounted to $1,388.74, excluding late fees, excess interest, and forced

placed insurance payments which had accrued when Plaintiff.0 failed to maintain insurance on

the vehicle.  (*Id*. at ¶¶ 18-21).  On March 6, 2009, Wells Fargo again contacted NLR, which

dispatched Mr. Gettig to recover the vehicle a second time.  (*Id*. at ¶ 22).

That morning, Plaintiff prepared to take her eight-year-old daughter Kayla to a dentist

appointment.  Due to her illness, Plaintiff testified that her sister, Angela, who shared a home

with Plaintiff and Plaintiff's two children, often drove the car with Plaintiff in the passenger seat.

(Pl. Dep. at 23).  On March 6, Plaintiff, Angela, Kayla, and Plaintiff's son Michael climbed into

the car, with Angela in the driver's seat, and began to back out of the garage into the driveway.

Mr. Gettig then appeared at the foot of the driveway in an unmarked truck driven by his

wife, Beverly, who worked with Mr. Gettig.  (Pl. Dep. at 24; Gettig Dep. at 33).  Mr. Gettig

exited the truck and walked up the side of the car to the driver's window.  Plaintiff testified to

what followed:

> [Angela] cracked the window, and he [said] he had a paper to repossess the car.
> My sister [told] him no.  At that point, he asked for me directly, and ... I was frightened.  I
> didn't really know.  I didn't see the paper, and he ... told us he was going to repossess the
> car.... [I was frightened because] if a guy comes to the car saying he's repossessing, they
> are blocking us in.  I was caught off guard.  I really didn't know what was going on.  I
> was frightened.  I was ill.  I had just got through treatment, so I was really not expecting it
> at this time....  I knew I was delinquent in the payments.  However, I had made a payment
> thirty days before he showed up.... [But] I'm not contending that it would have brought
> me current....
>
> I proceeded twice to tell Mr. Gettig that he was not going to repossess my car.  I
> asked him to leave the property.  He did not.  He refused to leave the property.  At that
> point, I asked my son to get out of the vehicle, let the garage door back up, and I told my
> sister when he lets the garage door back up, to pull back in the garage.... [However,] I
> don't think I had identified myself [to Mr. Gettig] at this point....

Once my son opened the garage door, my sister was trying to put – drive the car back into the garage.  At that point, Mr. Gettig placed [himself] between the garage door and the car... at an angle....  Since he's in front of the car, my sister couldn't put it back in the garage, because she would have had to hit him to do so.  Then he starts saying something about calling the police and she was going to be an accessory if we didn't give him the car.  At that point, I asked my kids to get out of the car and go in the house, which they did.  I think my sister thought I was asking her to get out of the car as well, so she exited the vehicle....  I got in the driver's seat.  At this point, I really didn't know what I was going to do.  Once I got in the driver's seat, I proceeded to just attempt to turn the car and drive away....

At this point, [I had not asked for his documents regarding the repossession]  ....  As I proceeded to get the car to drive down the hill, Mr. Gettig was telling [his wife, who was driving the truck], giving her the signal to come up or move forward, basically blocking us in the driveway.  And as she was moving forward, I was moving at the same time, and that's when the cars made contact, and that's when the damage was done to the bumper on the driver's side [of my car]....

After the collision, I still managed to get the car turned to go down the hill, and at some point as I was driving, Mr. Gettig – I don't remember if that back door on the driver's side of the back seat was opened or if he opened it, but he jumped in the car at some point....  [The car] couldn't have been [moving] too fast because we were in the driveway....

He jumped in the car as I was driving it down the hill....  As I was driving through the yard, my neighbor on that side has a – I guess it's BellSouth has a system or a pole of some sort that was there.  I hit that pole, and the car got stuck.  And while we were stuck on the pole, you know, I was still trying to get it off whatever we [were] stuck on, and he said "I think we're stuck," or whatever statement he made.  I again asked him several times to get out of the car.  I asked him to leave the car.  He refused.  At that point, he started to attempt to take the keys, snatch them from me, whatever, out of the ignition, wherever they were.  I'm not exactly sure....  The car was still running....  [The keys were] in the ignition....  And then, as I was cutting the car off, at some point he did snatch the keys from the ignition.

He jumped out of the car, and I jumped out behind him, and we were kind of tussling about the keys[.]  During the tussle ... I just made one attempt to take [the keys] out of his hand.  At that point, he proceeded to tell [his wife] to hook the car up anyway, and she did.  And once the car was hooked up, Mr. Gettig took my key from the key chain to the car, and he threw the rest of the keys in the grass....  I proceeded to sit on top of the car, and I was not going to move....  I don't think I ever got a chance to say "I'm Takitia Yeldell," but I think that that would have been understood at that point....  Because I'm the one trying to defend the car, get it away from this situation.

5

(Pl. Dep. at 25-37).

Mr. Gettig testified to the same events as follows:

[W]e showed up [at Plaintiff's house] as they were getting into the car, and we pulled up behind them.  And I got out and tried to engage [the driver] in a conversation. But all I got was, you know, "[Plaintiff's] not here and I can't give you the vehicle." That's – the driver told me that....  This was through a series of the window being up and then down and then up, you know, just barely cracked....  So I walked back to the truck to confer with my wife ... we were kind of at an impasse because nobody would talk to us.  I didn't know who the people were.  The only person that I could actually see was the driver, because the windows were tinted on the car....  I learned later, I believe, it was [Plaintiff's] sister that was driving....

[My truck] was parked about a half a car length behind their car...in their driveway... on their property.  [Meanwhile], the teenage boy had gotten out of the car. The rest of the people were still in the car.  He opened the garage for them.  I walked back up to the car and stood with my left leg in front of the driver's side [headlight]....  I had just talked with Plaintiff's sister], but, basically, it was about she wouldn't tell me, you know, where [Plaintiff] was, how I could get in touch with her, that sort of thing.  When I walked up in front of the car after that, they didn't say anything to me at all.  At no point was I ever told to get off the property, get out of the way, anything along that lines.

The passenger, [Plaintiff], got out, told her family to go in the house.  She got in the driver's side....  I believe she walked around the front of the car behind me and then got into the driver's side....  I was trying to [speak to her], but she just ignored me....  She got behind the wheel and she proceeded to try to back up.  At that point, my wife had already backed up behind the car a little bit further and stopped, and [Plaintiff] was trying to do some kind of maneuver.  I don't know when the collision occurred, but it was at some point when she was trying to get the car maneuvered to angle towards the neighbor's yard.  At that point, I did not know what she was trying to do....  I was trying to talk to her.  She wouldn't talk to me.  So I jumped into the [driver's] side backseat.... And I tried to talk to her, but she took off down the hill and she proceeded to hit a telephone box....

She tried to shift gears, tried to back up, go forward, back up, go forward, and I told her at that point that I thought we were stuck.  And she was very polite, but she said, "Sir, you need to get out of my car."  And I didn't reply.  I was trying to figure out how to get her from going anywhere at that point.  While she had her hand on the gear shift, I tried to reach across to turn off the car.  And as I was doing that, she moved her arm this way (indicating), and we brushed.

At that point – she was polite up until that point, but she started going, "You laid

6

hands on me, you laid hands on me." And I was like, "No, I didn't. I barely even touched you, and it's wasn't even my hands." And then I withdrew back to the backseat.... [W]hen she let her hand off the gear shift, I think it was either in drive or reverse, I reached through the middle of the seats and forced it into park and held it there. At that point, she started beating on my arm and trying to pull my arm off of it with both hands. So I was able to reach across, without touching her, and turn the [car] off and pull the keys out. At that point, she tried to come over the seats to get at me. I assume to get the keys from me.

I got out of the back seat.... I was standing in the yard. She grabbed ahold of my arms and was kind of tugging on me. Never really tried to get the keys, just kind of shook me a little bit and was telling me that – you know, give her the keys back. So I walked off into the street. We were in the neighbor's yard at this point. I took the key for the car that we were trying to repossess, and I threw her keys in her yard so that she would have her personal property....

At that point, I think she had gotten up on the hood of the car, and ... I think she was talking about calling the cops, and I said, "Well, do you want us to call them or do you want to call them?" She was like, "We'll call them." So I walked up to — I had no reception on my cell phone, and I walked up the hill past all the houses to call my supervisor to let him know what was going on and everything....

[Plaintiff] was sitting on top of the hood when I came back down waving at some neighbors that were leaving, telling them to come over there, and she was smiling at them and everything. And the other neighbor next door had come out. She hadn't really said anything. She was just looking at her telephone box trying to figure out what had happened.... I think I waited in the truck after that. I made one more trip up the hill to make a phone call and came back down and waited in the truck until ... the sheriff's department showed up.... I did my report, and she did hers. At that point, I found out that she was Takitia Yeldell. I hadn't even known at that point [who she was]...."

(Gettig Dep. at 46-56).

After Plaintiff and Mr. Gettig provided statements to the sheriff deputies, Mr. Gettig presented the repossession documents. (*Id*. at 47-48). One deputy, who is not identified in the record, reviewed the documents and told Plaintiff that Mr. Gettig could take the car. Plaintiff relinquished the vehicle, and the Gettigs removed it from her property. (*Id*. at 48). The vehicle was later sold at auction, and Plaintiff was notified via mail that she owed Wells Fargo

7

approximately $8,976.72 for the deficiency.  (Compl. ¶ 32).

## II.    PROCEDURAL HISTORY

Plaintiff filed her Complaint in the Circuit Court of Jefferson County on July 6, 2009, asserting claims against Wells Fargo, NLR, and Mr. Gettig for negligence (Count I), wantonness (Count II), conversion (Count III), and intentional infliction of emotional distress (Count IX). Plaintiff also asserted a claim against Wells Fargo for violation of the Uniform Commercial Code, codified at ALABAMA CODE § 7-9A-609 (Count IV).  Against NLR and Mr. Gettig, she asserted claims for violation of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (Count V), and invasion of privacy (Count VIII).  Against NLR, she asserted claims for negligent supervision and training (Count VI), and reckless and wanton supervision and training (Count VII).  NLR and Mr. Gettig filed an Answer to the Complaint on August 4, 2009.  (Notice of Removal (doc. 1), exh. A at 21-31 of 40).  Defendants removed the case to this court on August 7, 2009.  (Doc. 1).  Plaintiff does not contest the removal.

At the close of discovery Plaintiff filed a Motion for Partial Summary Judgment, seeking judgment as a matter of law on her claim that Wells Fargo violated ALABAMA CODE § 7-9A-609. She also argues that all three defendants should be liable for negligence *per se*, premised on Wells Fargo's violation of the above provision.  (Doc. 18).  On June 4, 2010, NLR and Mr. Gettig filed a Motion for Summary Judgment as to all claims against them.  (Doc. 19).  Wells Fargo also moved for Partial Summary Judgment as to Plaintiff's conversion claim against it. (Doc. 21).  On July 7, 2010, Plaintiff filed a Motion to Strike NLR's and Mr. Gettig's reply brief in support of their Motion for Summary Judgment.  (Doc. 27).  As previously stated, the motions have been fully briefed and are now under submission.

III.    STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S. Ct. 2553. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S. Ct. at 2553.

The substantive law will identify which facts are material and which are irrelevant. *Chapman,* 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman,* 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S. Ct. at 2510; *Chapman,* 229 F.3d at 1023. If the evidence presented by the nonmoving party to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249, 106 S. Ct. at 2511.

9

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick,* 2 F.3d at 1115-17, citing *U.S. v. Four Parcels of Real Property,* 941 F.2d 1428 (11th Cir. 1991) (*en banc*).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial.  *Fitzpatrick,* 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case.  *Fitzpatrick,* 2 F.3d at 1115-16.  If the movant meets its initial burden

10

by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *Lewis v. Casey,* 518 U.S. 343, 358, 116 S. Ct. 2174, 2183, 135 L. Ed. 2d 606 (1996), citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351(1992).

While the court is considering cross-motions for summary judgment, each movant retains its own burden of establishing that no genuine issues of material fact are present and that it is entitled to judgment as a matter of law.  *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting,* 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).[4]  The court will consider each motion independently and in accordance with the standard set forth in FED. R. CIV. P. 56, *infra.  See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

## IV.   ANALYSIS

### A.   Plaintiff's Motion for Partial Summary Judgment

---

[4] *See Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir. 1981) (decisions of the former Fifth Circuit dated prior to October 1, 1981, are binding precedent in the Eleventh Circuit).

Plaintiff does not dispute that she defaulted on her payments to Wells Fargo, or that Wells Fargo was entitled to repossess the car on the morning of Friday, March 6, 2009.  However, Plaintiff moves for summary judgment on grounds that Wells Fargo violated ALABAMA CODE § 7-9A-609 when Mr. Gettig repossessed the car.  If the court grants her summary judgment on this claim, she urges the court to also find that all three defendants are liable for negligence *per se*.

### 1.   ALABAMA CODE § 7-9A-609

ALABAMA CODE § 7-9A-609 provides that a secured party may repossess collateral without judicial process, "if it proceeds without breach of the peace."  In her Complaint, Plaintiff alleges that Wells Fargo violated this provision because its "manner of repossessing the Vehicle was a breach of the peace."  (Compl. ¶ 49).  Specifically, Plaintiff argues that Mr. Gettig breached the peace when he (1) blocked the car as Plaintiff's sister attempted to drive back into the garage; (2) entered the car as Plaintiff attempted to drive away; (3) disregarded Plaintiff's statement that he could not have the car; (4) caused Plaintiff's car to strike his truck, then her neighbor's telephone box; (5) ignored Plaintiff's request to leave the car; (6) made contact with Plaintiff as he took the keys from the ignition; (7) struggled with Plaintiff to prevent her from retaking the keys; and (8) caused Plaintiff to call law enforcement.[5]

Wells Fargo responds that it should not be liable for violating § 7-9A-609, because any breach of the peace that occurred was the result of Plaintiff's conduct, not Mr. Gettig's.  It argues

---

[5]  Although Mr. Gettig was employed by NLR, not Wells Fargo, at the time of the repossession, Wells Fargo will be liable for any conduct by Mr. Gettig that violated ALABAMA CODE § 7-9A-609 in this case.  "[A]n employer is not ordinarily liable for the tortious acts committed by an independent contractor[.  However,] this general rule has important exceptions.  One is that an employer is responsible for the manner of the performance of certain nondelegable duties, though done by an independent contractor," including the duty to avoid a breach of the peace when repossessing a vehicle.  *General Finance Corp. v. Smith*, 505 So. 2d 1045, 1047 (Ala. 1987); *Thrash v. Credit Acceptance Corp.*, 821 So. 2d 968, 972 (Ala. 2001).  Therefore, Wells Fargo could not – and does not – maintain an argument that it should avoid liability for Mr. Gettig's actions if they caused a breach of the peace.

that, although Plaintiff knew she had defaulted on her payments to Wells Fargo, she (1) refused to identify herself to Mr. Gettig until law enforcement arrived, creating suspicion that she was stealing the car when she attempted to drive away; (2) drove the car into her neighbor's yard, colliding with the Gettigs' truck and then with the neighbor's telephone box, causing damage to the car; (3) struggled with Mr. Gettig both inside and outside the car over control of the car keys; and finally, (4) called law enforcement, then sat on top of the car waving at neighbors until law enforcement arrived.

Wells Fargo's point is well taken.  However, ALABAMA CODE § 7-9A-609 does not define what conduct involves a "breach of the peace."  It also does not distinguish between a breach of the peace that is caused by the debtor and a breach of peace caused by the creditor.  The Alabama Supreme Court has explained that, pursuant to § 7-9A-609, a secured creditor "may repossess collateral at the secured party's own convenience, and neither a demand for possession nor the debtor's consent is required before the secured party is entitled to take possession." *Collins v. Gulf Furniture,* 579 So. 2d 6, 7 (Ala. 1989), citing *Salter v. AmSouth Bank,* 487 So. 2d 927 (Ala. Civ. App. 1985), and *Pierce v. Ford Motor Credit Co*., 373 So. 2d 1113 (Ala. Civ. App.), *cert. den.,* 373 So. 2d 1115 (Ala. 1979).  Nevertheless, a secured creditor's right to repossess collateral without judicial process is a "limited privilege" that "turns on the reasonableness of the manner and time of the entry" by a creditor onto a debtor's property. *Madden v. Deere Credit Services, Inc.*, 598 So. 2d 860, 864-65 (Ala. 1992), citing Restatement (Second) of Torts § 183 (1965) ("Since the [creditor] has parted freely and voluntarily with his original possession, he is not privileged to recover it by force, and must resort to his remedy at law.").  Furthermore, "the secured creditor ... may not perpetrate 'any act or action manifesting

13

force or violence, or naturally calculated to provide a breach of the peace.'" *Madden*, 598 So. 2d at 865, quoting *Crews & Green v. Parker,* 68 So. 287, 288 (Ala. 1915).  Nor may a creditor make use of threats or intimidation "to compel the submission of plaintiff against his will to the appropriation of what he asserts to be his property."  *W. J. Speigle v. Chrysler Credit Corporation*, 323 So. 2d 360, 362-63 (Ala. Civ. App. 1975).  "The threats or intimidation referred to are those which if carried out would amount to a breach of peace or if resisted would tend to promote a breach of peace."  *Id*.

The court finds nothing in these authorities, or in any case or treatise cited by Wells Fargo, which instructs that the privilege afforded to secured creditors under ALABAMA CODE § 7-9A-609 may be exercised over a debtor's protest that arguably creates a breach of the peace.  The statute provides only that a creditor must proceed without a breach of the peace.  The cases cited by Wells Fargo address only whether the conduct of a creditor violated ALABAMA CODE § 7-9A-609.  *See, e.g., Speigle*, *supra* (no breach of peace where debtor drove car to creditor's office to discuss payment plan for defaulted payments, creditor blocked car in by parking another vehicle behind it while debtor was inside office, no evidence of threats or rude language, or actual or constructive physical force by creditor or its agents); *Callaway*, *supra* (jury should decide whether breach of peace occurred where creditor ignored debtor chasing creditor's vehicle down street with debtor's car attached, and vehicle ran over debtor's foot and killed debtor's cat); *Burgin v. Universal Credit Co.*, 98 P. 2d 291 (Wash. 1940) (jury should decide whether breach of peace occurred where creditor towed debtor's car to neighboring town, with debtor seated inside in protest); *Sanchez v. Mbank of El Paso*, 792 S.W. 2d 530 (Tex. Ct. App. 1990) (jury should decide whether breach of peace occurred where creditor ignored debtor's protest, towed

14

debtor in car and left her in locked garage until debtor's husband and police arrived); *Abernathy v. Alabama*, 155 So. 2d 586, 592 (Ala. 1962) (defendants were charged with breaching the peace, court observed generally that "[t]he question of whether certain conduct constitutes a breach of the peace depends largely upon the facts of each particular case and the circumstances surrounding the incident.").  *See also Madden*, *supra* (jury should decide whether breach of peace occurred where creditor allegedly broke through a padlocked gate on debtor's property); *Thrash v. Credit Acceptance Corp.*, 821 So. 2d 968, 972 (Ala. 2001) (jury should decide whether breach of peace occurred where creditor placed liquid dish soap on debtor's driveway to remove vehicle from debtor's property, without informing debtor soap was there or removing the same before leaving; debtor later severely injured after slipping on soap).  These cases do not consider whether their outcomes would be the same, or different, if the breach of peace was caused by the debtor and not the creditor.  Wells Fargo makes no effort to explain why the court should recognize this distinction in the absence of either binding or persuasive authority to that effect. The court, therefore, rejects Wells Fargo's argument that it should avoid liability under § 7-9A-609 because Plaintiff may have caused a breach of the peace.

The court similarly rejects Plaintiff's argument that she is entitled to judgment as a matter of law based on evidence that Mr. Gettig breached the peace.  Viewing the evidence in the light most favorable to Wells Fargo, the court finds sufficient bases in the record upon which a jury could find that Plaintiff did not ask Mr. Gettig to leave the property or tell him he could not repossess her car, and that Mr. Gettig believed Plaintiff was trying to steal the car.  Furthermore, prevailing case law in Alabama suggests that Mr. Gettig's conduct, though potentially causing a breach of the peace, may have been privileged efforts to prevent damage and/or injury to property

15

and/or innocent bystanders. In *Madden*, 598 So. 2d at 864-65, the Alabama Supreme Court

found the Restatement (Second) of Torts § 183, "instructive" as to "the context of the limited

privilege traditionally accorded to secured creditors to enter the land of another to reclaim

collateral[.]" 598 So. 2d at 864. § 183 provides that

> (1) Except as otherwise agreed, a conditional vendor or lessor of a thing who is entitled to immediate possession thereof, or a successor to his legal interest in the thing, is privileged, at a reasonable time and in a reasonable manner, to enter land in the possession of the vendee or lessee, for the purpose of taking possession of the thing and removing it from the land.
>
> (2) The privilege stated in Subsection (1) is also available against
>
>> (a) a transferee of the thing or the land, or
>> (b) a possessor of land who, knowing or having reason to know of the transaction, has placed the thing on the land or consented to its being placed there.
>
> (3) The privileges stated in Subsections (1) and (2) are also available to
>
>> (a) a chattel mortgagee, or the holder of other security instruments,
>> (b) a mortgagor or pledgor of a thing who by satisfying his obligation has become entitled to the immediate possession of the thing, and
>> (c) a bailor of a thing who by reason of the termination of the bailment is entitled to the immediate possession of the thing.

The court explained in *Madden* that "[u]nder the Restatement view, the question of the extent of

the creditor's privilege turns on the reasonableness of the manner and time of the entry." 598 So.

2d at 864. The court further quoted Comment h of § 183 to explicate the Restatement's view of

the creditor's privilege. *Id*. Comment h to § 183 states:

> The privilege stated in this Section is one of entry in a peaceable and reasonable manner to remove the thing from the land. It does not justify the use of any force to enter, to remove the thing, or to prevent interference by the possessor. Since the conditional seller or other actor has parted freely and voluntarily with his original possession, he is not privileged to recover it by force, and must resort to his remedy at law.... The actor will therefore be liable if he breaks and enters the land, as by removing a padlock.

16

Under exceptional circumstances the actor may have a privilege to use force. Thus he may be so privileged where the thing has been taken from his possession by a fraudulent transaction and he is in prompt pursuit, as stated in §§ 100-111, or where he reasonably believes that there is such a danger of destruction or serious injury to the thing as to bring the case within the rule stated in § 197.

The Restatement (Second) of Torts § 197(1) provides in relevant part that

> [o]ne is privileged to ... remain on land in the possession of another if it ... reasonably appears to be necessary to prevent serious harm to
>
> (a)    the actor, or his land or chattels, or
> (b)    the other or a third person, or the land or chattels of either, unless the actor knows or has reason to know that the one for whose benefit he enters is unwilling that he shall take such action.

Comment e further explicates § 197(1) as it relates to "acts done for protection of others":

> Where the actor enters for the protection of the possessor of the land or of a third person or the property of either, the privilege stated in this Section is available only where the actor believes that the person for whose benefit the entry is made is willing that the actor shall take such protective action. [ ]  The mere fact that the possessor of the land is unwilling does not destroy the privilege to act for the protection of the interest of a third person.

Although the court finds no authority addressing the interplay between the Restatement (Second) of Torts § 197 and ALABAMA CODE § 7-9A-609, the Alabama Supreme Court made clear in *Madden* that the Restatement is at least persuasive authority in the context of claims brought pursuant to § 7-9A-609.  Therefore, to the extent the record supports a finding that Mr. Gettig acted to prevent damage to the car – to which Wells Fargo undisputedly held an interest – and/or to protect the safety of third parties nearby, his conduct may have been privileged under § 197 of the Restatement (Second) of Torts.

Upon considering the evidence in the light most favorable to Wells Fargo, the court finds a question of material fact as to whether Mr. Gettig acted to breach the peace, or to prevent

17

damage to property and injury to bystanders.  Therefore, Plaintiff's Motion for Partial Summary

Judgment on this claim is due to be denied.

### 2.      Negligence *per se*

Plaintiff next argues that, if the court finds that Wells Fargo violated ALABAMA CODE §

7-9A-609, then all three defendants should be liable for negligence *per se*.

Negligence *per se*, or negligence as a matter of law,

> arises from the premise that the legislature may enact a statute that replaces the common-law standard of the reasonably prudent person with an absolute, required standard of care. *Thomas Learning Ctr., Inc. v. McGuirk*, 766 So. 2d 161, 171 (Ala. Civ. App. 1998). When the legislature adopts such a statute, anyone who violates it and causes an injury to a person whom the statute was intended to protect is liable for negligence per se.  *Id*. Proof of a violation of the statute is proof of negligence.  *Id*.

*Parker Bldg. Services Co., Inc. v. Lightsey ex rel. Lightsey*, 925 So. 2d 927 (Ala. 2005).

However, "not every violation of a statute or an ordinance is negligence *per se*."  *Id*.  The

following elements must be proven before a negligence *per se* claim may proceed to trial: (1) the

statute in question was enacted to protect a class of persons to which the plaintiff belongs; (2) the

plaintiff's injury was of a type contemplated by the statute; (3) the defendant violated the statute;

and (4) the defendant's violation of the statute proximately caused the plaintiff's injury.  *Fox v.

Bartholf*, 374 So. 2d 294, 295 (Ala. 1979).

Defendants assert that Plaintiff's negligence *per se* claim should fail because she did not

plead it in her Complaint, or move to amend her Complaint to state such a claim pursuant to FED.

R. CIV. P. 15.  They cite to the Eleventh Circuit's reasoning in *Gilmour v. Gates, McDonald &

Co.*, 382 F. 3d 1312, 1314-15 (11th Cir. 2004), in which the court explained that

> the Supreme Court has mandated a liberal pleading standard for civil complaints under FEDERAL RULE OF CIVIL PROCEDURE 8(a).  This standard however does not afford

18

plaintiffs with an opportunity to raise new claims at the summary judgment stage....
Efficiency and judicial economy require that the liberal pleading standards under
*Swiercewicz* [*v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)]
and Rule 8(a) are inapplicable after discovery has commenced.  At the summary
judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the
complaint in accordance with FED. R. CIV. P. 15(a).

*Gilmour* considers whether a plaintiff may, for the first time, raise a new claim in her

response to a defendant's summary judgment motion.  Here, Plaintiff raises the claim in her own

motion for summary judgment.  While *Gilmour* is not completely on point with this case, the

court's reasoning applies here.  The Eleventh Circuit explained that a defendant "has no notice"

of a claim raised for the first time on summary judgment, and that "liberal pleading does not

require that, at [the summary judgment] stage, defendants must infer all possible claims that

could arise out of facts set forth in the complaint.  The proper procedure for [a plaintiff] to assert

... new claim[s] [is] to amend her complaint," a step which cannot be accomplished merely

"through argument in a brief opposing summary judgment."  382 F. 3d at 1315.  Plaintiff does

not oppose this argument in her reply brief.  Accordingly, premised on the authority of *Gilmour*,

which is undisputably binding on this court, the court agrees with Defendants that Plaintiff failed

to allege a negligence *per se* claim in her Complaint, and may not raise the same for the first time

in her motion for partial summary judgment.

Even if she had properly asserted the claim in her Complaint, however, the court finds

that Plaintiff is not entitled to summary judgment thereon.  On order to satisfy the third element

of a negligence *per se* claim, Plaintiff must demonstrate that Defendants violated ALABAMA

CODE § 7-9A-609.  As previously stated, the court reserves that determination for the province of

a jury.  Because Plaintiff has not established, as a matter of law, that Defendants violated this

provision, she is not entitled to summary judgment on her negligence *per se* claim.[6]  Therefore,

her motion on this claim is due to be denied.

### B. Wells Fargo's Motion for Partial Summary Judgment

In Count III of her Complaint, Plaintiff alleges that "[t]he Defendants did not have a

present and immediate right of possession" of her car on the day Mr. Gettig repossessed it, and

that, "[w]ithout the Plaintiff's consent, the Defendants intentionally deprived the Plaintiff of her

rightful possession of the Vehicle."  (Compl. ¶¶ 45-46).  Wells Fargo moves for summary

judgment on this claim on grounds that it did, in fact, have an immediate right of possession of

the car on March 6, 2009, premised on Plaintiff's failure to timely pay monthly installments as

provided for under the contract between Plaintiff and Wells Fargo.

"To prove conversion, [a plaintiff] must present evidence of 'a wrongful taking or a

wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or

misuse.'" *Ex parte Anderson*, 867 So. 2d 1125, 1129 (Ala. 2003), quoting *Ott v. Fox*, 362 So. 2d

836, 839 (Ala. 1978).  "The gist of the action is the wrongful exercise of dominion over property

in exclusion or defiance of a plaintiff's right, where said plaintiff has general or special title to

the property or the immediate right to possession."  *Ott*, 362 So. 2d at 839.  "[A] wrongful

repossession of personalty will support such a claim."  *Id.*

The parties do not dispute that Plaintiff had fallen behind on her payments to Wells

---

[6] Defendants argue further that Plaintiff has failed to satisfy the first and fourth elements of a negligence *per se* claim, and that her motion for summary judgment should be denied for these reasons.  Because the court disposes of the claim as explained *supra*, it does not address these additional arguments.

Fargo, and was therefore in default in repaying the loan.[7]  Plaintiff also appears to concede that Wells Fargo had an immediate right of possession of the car when Mr. Gettig appeared on her property to repossess the same.  Instead, she maintains that any right of possession Wells Fargo had that morning was lost when Mr. Gettig breached the peace in violation of ALABAMA CODE § 7-9A-609.  Consequently, she argues that Defendants converted the car when Mr. Gettig repossessed it without a right to do so.

Wells Fargo offers no rebuttal to this argument.  The cases cited in its initial brief do not address whether a creditor that repossesses collateral upon a breach of the peace should be liable for conversion.  *See Ex Parte Anderson*, *supra* (where daughter inherited car from mother but title to car remained in father's name, daughter could pursue conversion claim against the restoring agency that did not own the car, but sold the car without notifying daughter); *Davis*, *supra* (lessor of car did not convert vehicle upon default by lessee "because, by virtue of the lease agreement, [lessor] owned the [car], and, therefore, had the right to repossess the vehicle when the [lessees] failed to make timely payments."); *Callaway*, *supra* (a creditor is entitled to take possession of collateral upon default by debtor); *Harkness v. EZ Pawn Alabama, Inc.*, 724 So. 2d 32 (Ala. Civ. App. 1998) (creditor not required to perfect security interest in collateral before repossessing the same); *Mann v. Bank of Tallassee*, 694 So. 2d 1375 (Ala. Civ. App. 1996) (creditor entitled to summary judgment on debtor's claim of conversion, where undisputed facts showed that debtor was in default and that creditor held a valid security interest in collateral);

_____

[7]  Plaintiff conceded that she was in default at her deposition, and does not dispute the same in her opposition brief.  She testified that she was confused as to the amount by which she was behind in her payments.  (Pl. Dep. at 26, 28).  However, "[t]he extent of the default is not material as to the right of repossession by the creditor, because, after default, the creditor has a right to immediate possession of the collateral."  *Davis v. Ford Motor Credit Company,* 599 So. 2d 1123, 1126 (Ala. 1992).

*Pierce v. Ford Motor Credit Company*, 373 So. 2d 1113 (Ala. Civ. App. 1979) (no conversion where creditor followed debtor and found car parked with keys inside, repossessed car without notifying debtor after debtor defaulted on loan).  However, in *Crews & Green v. Parker*, 68 So. 287, 288 (Ala. 1915), the Alabama Supreme Court observed that "[a]ny act or action manifesting force or violence, or naturally calculated to provoke a breach of the peace, in the recaption of property renders the actor a trespasser, and precludes him from availing of his right to retake the property."[8]  *See also Speigle*, 323 So. 2d at 362 ("It has long been the law in this state that the title holder under a conditional sales contract, who becomes entitled to repossess for conditions of the contract broken, may take possession of the property, provided he does not in doing so use force or threats of violence against the person having possession or control or does not breach the peace.").

Because Wells Fargo has moved for summary judgment, it is their burden to establish that it is entitled to judgment as a matter of law on Plaintiff's conversion claim.  However, as stated, it offers no rebuttal to Plaintiff's argument that Wells Fargo lost its right of immediate possession when a breach of the peace occurred.  It also makes no effort to explain to this court why *Crews & Green* should not apply here.

The question whether a breach of peace occurred in this case has been reserved for a jury to decide.  Because the court cannot determine that Wells Fargo converted Plaintiff's car without first finding that Mr. Gettig breached the peace, it disagrees that Wells Fargo is entitled to

---

[8]  The facts before the court in *Crews & Green* are described briefly as follows: a restauranteur in Birmingham financed the purchase of "an ice box, a table, and 11 chairs" through the defendant.  The parties disputed whether the plaintiff had defaulted in his payments to defendant, and defendant repossessed the collateral "in a rude and rough manner" against the plaintiff's will and despite his objection.  68 So. at 288.  No further factual information is provided in the court's opinion.

judgment as a matter of law on this claim.  Its motion for partial summary judgment, therefore, is due to be denied.

### C.    Motion for Summary Judgment by NLR and Robert Gettig

NLR and Mr. Gettig move for summary judgment as to all claims asserted against them by Plaintiff in her Complaint.  These claims include (1) negligence (Count I); (2) wantonness (Count II); (3) conversion (Count III); (4) violation of the Fair Debt Collection Practices Act (Count V); (5) negligent training and supervision (Count VI); wanton training and supervision (Count VII); invasion of privacy (Count VIII); and intentional infliction of emotional distress (Count IX).  In her opposition brief, Plaintiff concedes that NLR is entitled to judgment as a matter of law on her claims for negligent and wanton supervision and training.  The remaining claims are addressed *infra*.

### 1.    Negligence

Plaintiff alleges that the defendants owed her a duty to avoid a breach of the peace when they repossessed her car.  (Compl. ¶ 35).  She maintains that Defendants breached that duty, and proximately caused her to suffer injury.  These injuries include depriving her of transportation, forcing her to incur expenses in finding alternate transportation, and causing her to suffer extreme embarrassment, shame, anxiety, and mental distress.  (*Id*. at ¶¶ 36-37).  NLR and Mr. Gettig move for summary judgment on this claim, on the basis that Plaintiff was contributorily negligent.

"Under the law of Alabama, a plaintiff cannot recover in a negligence suit when the plaintiff's own negligence is shown to have proximately contributed to the damage, notwithstanding a showing of negligence on the part of the defendant."  *Alabama Power Co. v.*

*Foster*, 555 So. 2d 174 (Ala. 1989), citing *Brown v. Piggly-Wiggly Stores*, 454 So. 2d 1370 (Ala. 1984) and *Alabama Power Co. v. Scholz*, 215 So. 2d 447 (1968). "[C]ontributory negligence is a complete defense to a claim based on negligence." *Knight v. Alabama Power Co.*, 580 So. 2d 576 (Ala. 1991); *Creel v. Brown*, 508 So. 2d 684 (Ala. 1987).

To prove contributory negligence, NLR and Mr. Gettig must establish that Plaintiff (1) had knowledge of the dangerous condition in question; (2) appreciated the danger under the surrounding circumstances; and (3) failed to exercise reasonable care by placing herself in the way of danger. *Brown*, 454 So. 2d at 1372; *Knight*, 580 So. 2d at 577-578. NLR and Mr. Gettig first argue that Plaintiff knew she was at risk of losing her car when she defaulted in her payments to Wells Fargo.

The court, however, need not consider whether Plaintiff knowingly exposed herself to that risk. That is not the question before the court. The question before the court is whether Defendants breached their duty to avoid a breach of the peace when they repossessed her car. This has nothing to do with whether Plaintiff defaulted in her payments to Wells Fargo.

Turning to this claim, NLR and Mr. Gettig maintain that Plaintiff knew and appreciated that the peace would be breached when she drove her car into her neighbor's yard. They suggest that the clearance of the vehicle, and the presence of the telephone box, should have been apparent when she turned the car onto the adjoining property. However, the record offers no evidence that Plaintiff either knew or should have known these facts on the morning in question. The record does suggest that Plaintiff was taken by surprise when Mr. Gettig appeared on her property. NLR has produced no evidence that Plaintiff both knew and appreciated that she would thwart her own attempt to avoid Mr. Gettig by getting the car stuck on a telephone box.

24

NLR and Mr. Gettig cite to *Hannah v. Gregg, Bland & Berry, Inc*., 840 So. 2d 839 (Ala. 2002), to support their argument that Plaintiff was contributorily negligent.  In *Hannah*, the Alabama Supreme Court considered whether a quality-control specialist who was crushed to death between two industrial machines had been contributorily negligent.  The court reasoned that "[t]he question of contributory negligence is normally one for the jury.  However, where the facts are such that all reasonable persons must reach the same conclusion, contributory negligence may be found as a matter of law."  840 So. 2d at 860.  In *Hannah*, the parties disputed whether the decedent followed all safety precautions prior to his death.  The court concluded that "we cannot say that the facts are such that all reasonable persons must reach the same conclusion regarding whether Hannah was contributorily negligent.  Whether Hannah was contributorily negligent is a question that must be left to the finder of fact to determine."  840 So. 2d at 862.

By contrast, the court in *Ridgeway v. CSX Transportation, Inc., et al*., 723 So. 2d 600 (Ala. 1998), found that the defendants established contributory negligence by the plaintiff's wife.  The undisputed facts there showed that the plaintiff's wife drove her car over a railroad crossing as a train approached.  Though she was aware of the railroad crossing, which was clearly marked, she did not stop, look, or listen before crossing, despite the train conductor's efforts to get her attention by blowing the train's horn.  The court explained that

> [t]here is a rebuttable presumption that a person in possession of his normal faculties will follow the law of self-preservation and exercise ordinary care for his own personal protection....  [W]e conclude that the only reasonable inference that can be drawn from that evidence is that Ms. Ridgeway's tragic death was the result of her own failure to exercise reasonable care.

723 So. 2d at 606.

In *H.R.H., Inc. v. Miller*, 833 So. 2d 18 (Ala. 2002), the plaintiff suffered disabling

25

injuries from falling 20 feet through a skylight at a construction site.  The trial court instructed the jury that it "must be reasonably satisfied that Mr. Miller's appreciation of the danger was a conscious appreciation of that danger at the moment that the incident occurred."  833 So. 2d at 26.  The Alabama Supreme Court held this instruction in error, and explained that while "contributory negligence may be predicated upon a finding of assumption of the risk, 'it has long been recognized that contributory negligence may also be predicated upon the *failure to appreciate the danger* when there is a reasonable opportunity to do so under the circumstances.'" 833 So. 2d at 27, quoting *Alabama Power v. Moseley*, 318 So. 2d 26, 263 (Ala. 1975) (emphasis provided by *Miller* court).  The court ordered a new trial rather than answer whether the plaintiff had been contributorily negligent.

None of the above authorities are on point with this case, nor do they persuade the court that Plaintiff was contributorily negligent as a matter of law.  The questions whether she knew and appreciated the risk of breaching the peace, and failed to exercise reasonable care, are reserved for a jury to decide.

NLR next argues that Plaintiff's attempt to drive the car off the property was an intervening efficient cause of her damages.  As to this argument, the Alabama Supreme Court has explained that

> [n]egligence alone does not afford a cause of action.  Liability will be imposed only when negligence is the proximate cause of injury; injury must be a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury.  If, between the alleged negligent act or omission and the injury, there occurs an independent, intervening, unforeseeable event, the causal connection between the alleged negligence and in the injury is broken.  *Mobile City Lines, Inc. v. Proctor,* 272 Ala. 217, 130 So. 2d 388 (1961); *Mahone v. Birmingham Electric Co.,* 261 Ala. 132, 73 So. 2d 378 (1954).

The key here is foreseeability. This court has held many times that a person, who by some act or omission sets in motion a series of events, is not responsible for consequences of intervention of another agency, unless at the time of his original act or omission, the act of the intervening agency could reasonably be foreseen. If so, the causal chain is not broken. If the injury results from an independent intervening, efficient cause, not reasonably foreseeable, the original negligent act or omission is not the proximate cause of injury. *Liberty National Life Insurance Co. v. Weldon,* 267 Ala. 171, 100 So. 2d 696 (1958); *Watt v. Combs,* 244 Ala. 31, 12 So. 2d 189 (1943); *Hammett v. Birmingham Railway, Light & Power Co.,* 202 Ala. 520, 81 So. 22 (1919).

*Vines v. Planation Motor Lodge*, 336 So. 2d 1338, 1339 (Ala. 1976).

NLR maintains that Plaintiff's conduct was an intervening efficient cause because (1) she drove the car into the telephone box in her neighbor's yard after Mr. Gettig breached the peace, apparently by climbing into the car; (2) her behavior was unforeseeable to Mr. Gettig; and (3) her "desperate and reckless behavior" was sufficient to be the sole cause-in-fact of her injuries.  *See Gilmore v. Shell Oil Co.*, 613 So, 2d 1272, 1275 (Ala. 1993) (to establish an intervening efficient cause, it must (1) occur after the defendant's negligent act, (2) be unforeseeable to the defendant, and (3) be the sole cause-in-fact of the plaintiff's injury).

The court has already found a question of fact as to whether a breach of the peace occurred when Mr. Gettig repossessed Plaintiff's car.  Consequently, the court can only speculate whether Plaintiff's efforts to prevent the car from being repossessed occurred before or after any alleged breach of the peace by the defendants.  Furthermore, the court is not convinced that Plaintiff's conduct was unforeseeable to Mr. Gettig.  Mr. Gettig testified that, as of March 2009, he had been repossessing vehicles for approximately six years.  (Gettig. Dep. at 26).  During that time, he has encountered strong resistance from debtors, including verbal abuse, threats, and being shot at by a debtor.  (*Id.* at 67, 74-75)  Given Mr. Gettig's level of experience in this field, the court finds a question of material fact as to whether he could have reasonably foreseen

27

Plaintiff's efforts to prevent him from taking her car.  Premised on these findings, NLR and Mr. Gettig are not entitled to summary judgment on Plaintiff's negligence claim.

>           2.        **Wantonness**

In Count 2 of her Complaint, Plaintiff alleges the following:

> On the date of the incident made the basis of this suit, Robert Gettig, with reckless disregard of the natural or probable consequences of his actions, acted in a manner that resulted in a breach of the peace.  Defendants knew, or should have known, that their actions would likely or probably result in injuries such as those sustained by Plaintiff.  As a proximate cause of Defendants' wantonness, the Plaintiff has been deprived of the Vehicle, has incurred expenses for alternate transportation, and has suffered extreme embarrassment, shame, anxiety, and mental distress.

(Compl. ¶¶ 39-41).  NLR and Mr. Gettig move for summary judgment on this claim, asserting that any injuries Plaintiff suffered were caused by her own reckless behavior, and not that of Mr. Gettig.

"Wantonness involves the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Lilya v. Greater Gulf State Fair, Inc.*, 855 So. 2d 1049, 1056 (Ala. 2003); *see also Alfa Mut. Ins. Co. v. Roush*, 723 So. 2d 1250, 1256 (Ala. 1998) ("'Wantonness' is statutorily defined as '[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.' ALABAMA CODE § 6-11-20(b)(3). 'Wantonness' has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.  *Bozeman v. Central Bank of the South*, 646 So. 2d 601 (Ala. 1994).").

To maintain an action for wantonness, Plaintiff must demonstrate that NLR "participated

in conduct characterized by 'a reckless or conscious disregard of the rights or safety of others.'"
*Gibson v. Norfolk Southern Corp.*, 878 F. Supp. 1455, 1463 (N.D. Ala. 1994) (quoting CODE OF
ALABAMA 1975 § 6-11-20(b)(3)).  Plaintiff need not establish that NLR intended to cause her
injury in order to prevail on her wantonness claim.  *Id.*  She may avoid summary judgment on the
claim by providing evidence of "an inadvertent act or failure to act, when the one acting or
failing to act has knowledge that another is probably imperiled by the act or failure to act and the
act or failure to act is in reckless disregard of the consequences."  *Hamme v. CSX Transportation,
Inc.,* 621 So. 2d 281, 283 (Ala. 1993) (internal citations omitted).

Common to each of these definitions is the requirement that Plaintiff demonstrate
knowledge by the defendant of a risk of harm, and a conscious disregard of that risk.  The record
indicates that Plaintiff herself was responsible for making her payments in full and on time each
month to Wells Fargo pursuant to their security agreement.  (Whiteside Decl., Exh. A (doc. 21-
2)).  Thus, the court finds no evidence to suggest that NLR or Mr. Gettig were responsible for
Plaintiff defaulting on her loan.  As for the repossession itself, Plaintiff argues that she would not
have attempted to drive the car away, or called law enforcement, had Mr. Gettig left her property
when she asked him to.

Accepting this as true, the court finds no evidence to suggest that Mr. Gettig knew or
should have known his efforts to speak with Plaintiff would result in any harm to the Plaintiff.
Plaintiff maintains that Mr. Gettig forced his way into the car, though the door to the backseat
may have been already hanging open when Plaintiff turned the vehicle onto the adjoining
property.  (Pl. Dep. at 31).  She argues further that his struggle to remove the keys from the
ignition caused the car to "crash" into the telephone box.  However, the record states the car had

already become stuck when the struggle for the keys ensued.  (*Id.* at 32).

The court cannot discern any basis to agree with Plaintiff that Mr. Gettig caused her to drive onto her neighbor's property and into a telephone box, with knowledge that Plaintiff was at risk of harm, and with a conscious disregard for her safety.  Accordingly, the court finds no question of material fact as to whether Mr. Gettig acted wantonly.  NLR's and Mr. Gettig's motion for summary judgment on this claim is due to be granted.

### 3.    Conversion

NLR and Mr. Gettig next move for judgment as a matter of law as to Plaintiff's conversion claim.  In their motion, NLR and Mr. Gettig assert that Mr. Gettig did not unlawfully convert the car because at the time of the repossession, Plaintiff was in default in her payments to Wells Fargo and Wells Fargo consequently had a right to immediate possession of the car.  This argument closely resembles the argument offered by Wells Fargo in its Motion for Partial Summary Judgment, and for the same reasons stated as to that motion, this court finds that NLR's and Mr. Gettig's motion on this claim is due to be denied.

NLR and Mr. Gettig rely heavily on the Alabama Supreme Court's decision in *Davis v. Ford Motor Credit Co*., 559 So. 2d at 1126, in which that court explained: "Ford Motor Credit did not exercise wrongful dominion over the vehicle, because, by virtue of the lease agreement, Ford Motor Credit owned the pick-up truck, and, therefore, had the right to repossess the vehicle when the Davises failed to make timely payments."  As stated above, however, the question before this court is not whether Plaintiff defaulted in her payments to Wells Fargo.  The issue is whether Defendants recovered the vehicle from Plaintiff without a breach of the peace; if not, pursuant to the Alabama Supreme Court's decision in *Crews & Green*, *supra*, Defendants did not

30

have a right to repossess the vehicle without judicial process.  Because the answers to these

questions require factual determinations by a jury, the court finds that summary judgment on this

claim is due to be denied.

### 4.    FDPCA

In Count 5 of her Complaint, Plaintiff alleges that NLR and Mr. Gettig

> have engaged in collection activities and practices in violation of the Fair Debt Collection Practices Act.  Defendant[s] used false, deceptive, and misleading representations and means in connection with the collection of a debt in violation of 15 U.S.C. § 1692e, including, but not limited to, §§ 1692e(4), (5), (7), and (10).  Defendant[s] used unfair and unconscionable means to collect or attempt to collect the alleged debt in violation of 15 U.S.C. § 1692f, including, but not limited to, § 1692f(1), and (6).  The Defendant[s] engaged in conduct that the natural consequence of which is to harass, oppress, or abuse in violation of 15 U.S.C. § 1692d(1) and (2).  As a result of the Defendants' actions, the Plaintiff is entitled to an award of statutory damages, costs, attorney fees, and actual damages for worry, anxiety, nervousness, and mental anguish.

(Compl. ¶¶ 52-56).

In her response to NLR's Motion for Summary Judgment on this claim, Plaintiff

concedes that NLR and Mr. Gettig are not "debt collectors" as contemplated by the FDCPA, and

therefore, only § 1692f(6) these defendants.[9]  (Doc. 24 at 14).  Accordingly, NLR and Mr. Gettig

---

[9]  *See* 15 U.S.C. § 1692a(6), which defines a "debt collector" as

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another....  For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests.

*See also Warren v. Countrywide Home Loans, Inc.*, 342 Fed. Appx. 458, 460 (11th Cir. 2009) (FDCPA term "debt collector" expands for purposes of § 1692f(6) to include any business the principal purpose of which is to enforce security interests); *Kaltenbach v. Richards*, 464 F. 3d 524, 527 (5th Cir. 2006) ("Because the FDCPA's definition of 'debt collection' includes parties whose principal business is enforcing security interests only for [§ 1692f(6)] purposes, such parties ... are subject only to this provision and not to the rest of the FDCPA."), quoting Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed.Reg. 50097 (1988) (December 13, 1988).

are entitled to summary judgment as to all claims asserted in Count 5, with the exception of

claims asserted under § 1692f(6).

15 U.S.C. § 1692f(6) provides that

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--

(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

(B) there is no present intention to take possession of the property; or

(C) the property is exempt by law from such dispossession or disablement.

NLR argues Wells Fargo was entitled to repossess her car on March 6, 2009, because

Plaintiff was in default in her loan payments. Plaintiff responds that, even if Wells Fargo had a

present right to repossess the car, that right was lost when Mr. Gettig breached the peace. "By

taking the car anyway," she argues, "he violated 15 U.S.C. § 1692f(6)."

This argument is similar to the parties' contentions regarding Plaintiff's conversion claim.

The court likewise concludes that a question of fact remains as to whether a breach of the peace

occurred that deprived Wells Fargo of its right to repossess the car without judicial process.

Therefore, the court reserves this matter for a jury to decide, and finds that NLR's and Mr.

Gettig's motion for summary judgment on this claim is due to be denied.

### 5.    Invasion of Privacy

In Count 8 of her Complaint, Plaintiff alleges that NLR and Mr. Gettig

> undertook and/or directed communications to the Plaintiff constituting an invasion of
> privacy, as set out and described in the common law of the State of Alabama.  Said
> communications were made in disregard for Plaintiff's right to privacy.  Said
> communications were made to force, coerce, harass, embarrass and/or humiliate the
> Plaintiff into relinquishing control of the Vehicle....   The Plaintiff avers that the
> communications were made by individuals who were employees of and/or acting on
> behalf of [NLR].

(Compl. ¶¶ 71-72).  Nowhere in the Complaint, or in any documents filed with the court, has

Plaintiff specified what form of "communications" she received from NLR.  Thus, the court is at

a loss as to what factual basis Plaintiff is offering to support her claim as alleged in the

Complaint.

The Alabama Supreme Court has instructed that

> It is generally accepted that invasion of privacy consists of four limited and distinct
> wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving
> publicity to private information about the plaintiff that violates ordinary decency; (3)
> putting the plaintiff in a false, but not necessarily defamatory, position in the public eye;
> or (4) appropriating some element of the plaintiff's personality for a commercial use.

*Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997), citing *Norris v. Moskin Stores, Inc.,* 132 So.

2d 321 (Ala. 1961).  In her opposition brief, Plaintiff argues that Mr. Gettig committed a physical

intrusion upon her privacy by climbing into the backseat of her car and pulling the keys from the

ignition after she told him to leave her property.

Before the court addresses the merits of this claim, it notes that the allegations in

Plaintiff's Complaint appear to bear no relation to the arguments in her brief.  Her Complaint

speaks vaguely of "communications" by unidentified employees of NLR, while her brief refers

exclusively to Mr. Gettig for climbing into the backseat of her car and retrieving the keys from

the ignition.  Plaintiff makes no attempt to explain this apparent disconnect between her

pleadings and her argument on summary judgment.[10]

Without a meaningful explanation by the plaintiff as to what she means to allege with her invasion of privacy claim, the court considers the record as a whole and finds insufficient evidence to support the same.  In *Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174, 1178 (Ala. 1995), cited by NLR, Mr. Gettig and Plaintiff, the Alabama Supreme Court instructed as follows:

> This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.  *Nipper v. Variety Wholesalers, Inc.*, 638 So. 2d 778 (Ala. 1994); *Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705 (Ala. 1983); *Alabama Electric Co-operative, Inc. v. Partridge*, 284 Ala. 442, 225 o. 2d 848 (1969).  One may invade another's privacy through either an intrusion upon a physical space, such as a trespass, or by an invasion of one's "emotional sanctum"; the law prohibits a wrongful intrusion into either of these areas of privacy. *Phillips, supra.*  In defining the invasion of privacy tort, the Phillips Court quoted comment b to Restatement (Second) of Torts § 652B (1977):
>
> > "The invasion may be physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home.  It may also be use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs window with binoculars or tapping his telephone wires.  It may be by some other form of investigation or examination into his private concerns...."
>
> *Phillips*, 435 So.2d 705, 710-11 (Ala.1983).

NLR points out that the facts in the record do not rise to the level of outrage or humiliation to a "person of ordinary sensibilities."  The court agrees that Mr. Gettig's conduct is not tantamount to an invasion of privacy as contemplated by Alabama case law.  The court is

---

[10]   Plaintiff further muddles her invasion of privacy claim by alleging in her Complaint that Congress "recognized a consumer's inherent right to privacy in collection matters in passing the FDCPA[.]" (Compl. ¶ 70).  In an effort to reach an understanding as to what Plaintiff is attempting to say, the court finds the definition of "communications" in the FDCPA as "the conveying of information regarding a debt directly or indirectly to any person through any medium."  15 U.S.C. § 1692a(2).  The court finds no authority for the proposition that this definition of "communications" includes conduct of the type asserted by Plaintiff in her responsive brief.

particularly troubled by the lack of evidence that Mr. Gettig intentionally intruded into Plaintiff's

private affairs, or that he intended to physically intrude upon her physical space.  As stated

repeatedly *supra*, Mr. Gettig testified that he did not know who the plaintiff was and could not be

sure of her reasons for taking the car.  The record contains no evidence from which a jury could

find that Mr. Gettig intentionally invaded Plaintiff's privacy, or that his conduct rose was

outrageous or humiliating to a person of ordinary sensibilities.  Accordingly, NLR's motion for

summary judgment on this claim is due to be granted.

### 6.      Intentional Infliction of Emotional Distress

In Count 9 of her Complaint, Plaintiff alleges that

> the Defendants' actions were done willfully, maliciously, outrageously, deliberately, and
> purposely with the intention to inflict emotional distress upon the Plaintiff and/or were
> done in reckless disregard of the probability of causing the Plaintiff emotional distress,
> and these acts did in fact result in severe and extreme emotional distress.  As a result of
> the Defendants' conduct, the Plaintiff suffered worry, anxiety, nervousness, and mental
> anguish.

(Compl. ¶¶ 76-77).

A claim of intentional infliction of emotional distress is analogous to a claim of outrage,

which has been recognized by the Alabama Supreme Court in only three contexts: (1) wrongful

conduct in family burials, *see Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987), (2) heavy-handed,

barbaric means by insurance agents in attempting to coerce an insured into settling an insurance

claim, *see Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983), and (3) egregious

sexual harassment, *see Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989).

While no court has specifically held that a plaintiff may recover for outrage only in these

three circumstances, the range of conduct that qualifies a claimant to recover for intentional

infliction of emotional distress is limited in Alabama.  Plaintiff may establish a viable claim of outrage by demonstrating that Defendants' conduct was (1) intentional or reckless; (2) extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.  *Thomas v. Industrial Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993), citing *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).  However, assuming (without deciding) that NLR acted intentionally or even recklessly by repossessing her car in possible violation of ALABAMA CODE § 7-9A-609, the court is not satisfied that the evidence before it demonstrates conduct that is extreme or outrageous.  Plaintiff alleges that she has suffered worry, anxiety, nervousness and mental anguish as a result of NLR's repossessing her car.  By contrast, however, the Alabama Supreme Court has described conduct that generally supports an outrage claim as "conduct [that is] so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society[.]"  *Bowen*, 447 So. 2d at 141.  The facts alleged in Plaintiff's Complaint do not rise to a level of atrocity comparable to the range of conduct alleged in the cases cited *supra*.

For example, in *Bowen*, the following facts were deemed "sufficient" to support the plaintiff's outrage claim: (1) the defendants' obtaining, through bribery and extortion, false evidence to support criminal charges against the plaintiff; (2) threats by the defendants to kill the plaintiff's two small children and to cut the children's arms off; and (3) kidnaping the plaintiff, driving him into the woods, and forcing him to lie on the ground while holding a gun to his head, repeatedly snapping the hammer for an hour and a half before the plaintiff finally escaped – all in an effort to force the plaintiff to settle an insurance claim.  447 So.2d at 137.  In *Whitt*, the

36

defendant allegedly destroyed and desecrated the plaintiffs' century-old family cemetery; the court considered the same extreme enough, in light of the "[g]reat respect [that] is afforded the resting place of the dead," to constitute outrageous conduct. 519 So. 2d at 905-06. In *Busby*, female employees were entitled to recover for outrage based on multiple allegations of extreme sexual harassment by their supervisor. 551 So. 2d at 324.

While the court does not intend to make light of Plaintiff's suffering after her car was repossessed, it cannot conclude from the facts before it that NLR's or Mr. Gettig's conduct rose to the same level of outrageous behavior as alleged in the cases cited *supra*. Accordingly, NLR's Motion for Summary Judgment on this claim is due to be granted.

### D.        Plaintiff's Motion to Strike

Plaintiff moves to strike NLR and Mr. Gettig's reply brief filed in support of their motion for summary judgment. (Docs. 27, 26, respectively). She argues that the reply brief is due to be stricken because it does not comply with Appendix II of the court's Uniform Initial Order, entered on August 18, 2009. (*See* doc. 6).

According to Plaintiff,, the Order prohibits reply briefs from containing any legal arguments or analyses. She cites to page 18 of the Order, which provides that "[t]he reply submission, if any, shall consist of **only** the moving party's disputes, if any, with the non-moving party's additional claimed undisputed facts." (Emphasis supplied by Plaintiff). NLR's and Mr. Gettig's reply brief contains roughly two pages of factual discussion, and seven pages of legal argument. Plaintiff maintains that the brief "is primarily legal argument which this Court has disallowed pursuant to its Order." (Doc. 27 ¶ 6).

Plaintiff misreads the requirements as set forth in the court's Uniform Initial Order. The

Order does not require a reply brief to contain only factual statements.  To the contrary, the Order requires all briefs submitted on summary judgment to include (1) "a statement of allegedly undisputed relevant material facts," and (2) "a discussion of relevant legal authorities."  (Doc. 6 pg. 14).

To the extent Plaintiff relies on the statement quoted from page 18 of the Uniform Initial Order, Plaintiff is reminded that this portion of the Order is entitled "Manner of Stating Facts." Therefore, that portion of the Order is intended to relate only to parties' factual discussions in their summary judgment briefs.  For general questions regarding the overall contents of summary judgment briefs, Plaintiff is directed to the court's imperatives beginning on page 14 of said Order, beneath the heading "SUBMISSIONS."

The court finds no merit in Plaintiff's argument that the reply brief fails to comply with its Order.  Therefore, the motion to strike is due to be denied.

## V.    CONCLUSION

Premised on the above findings, the court concludes that Wells Fargo's Motion for Partial Summary Judgment (doc. 21) is due to be **DENIED**.  Plaintiff's Motion for Partial Summary Judgment (doc. 18) is also due to be **DENIED**.  The Motion for Summary Judgment filed by NLR and Mr. Gettig (doc. 19) is due to be **GRANTED in part and DENIED in part** as follows:

> The Motion is due to be granted as to Plaintiff's claims for wantonness (Count II), negligent training and supervision (Count VI), reckless and wanton training and supervision (Count VII), invasion of privacy (Count VIII), and intentional infliction of emotional distress (Count IX).  The Motion is due to be denied as to Plaintiff's claims for negligence (Count I), conversion (Count III), and violation of § 1692f(6) of the Fair Debt Collection Practices Act (Count V).

Plaintiff's Motion to Strike (doc. 27) is due to be **DENIED**.  An appropriate Order will be entered contemporaneously herewith.

     **DONE** this 2nd day of March, 2011.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge
